Robert G. FLEMING, Plaintiff,

v.

COUNTY OF KANE and Nabi R. Fakroddin, Defendants.

No. 85 C 8641.

United States District Court, N.D. Illinois, E.D.

April 12, 1988.

Heidi H. Katz, Steven B. Adams, Robert A. Heap; Fawell, James & Brooks, Naperville, Ill., for plaintiff.

Gerard B. Gallagher, Peter A. Bauer, Patricia J. Stiles, Mark C. Amador; Gallagher, Joslyn & McGurn, Oak Brook, Ill., Robert F. Casey, Theodore G. Schuster, Casey & Krippner, Geneva, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Robert Fleming ("Fleming"), fired from his long-held job with the County of Kane ("County") Highway Department, then sued both County and Fleming's boss who did the firing, Highway Superintendent Nabi Fakroddin ("Fakroddin"). Fleming brought his action under 42 U.S.C. § 1983 ("Section 1983"), charging his firing had been in retaliation for his exercise of First Amendment rights.[1] Fakroddin responded with a counterclaim for defamation.

After a jury trial:

1. Fleming prevailed before the jury on his constitutional claim against both defendants.

2. This Court withdrew Fakroddin's counterclaim from jury consideration, granting Fleming's Fed.R.Civ.P. ("Rule") 50(a) motion for a directed verdict at the close of Fakroddin's case-in-chief.

This memorandum opinion and order will deal with the host of post-trial motions since filed by the parties.

---

1. To be precise, Fleming's Section 1983 claim against state actors necessarily rests on the Fourteenth Amendment. However, courts and litigants have always found it convenient to refer instead to the underlying Bill of Rights provisions deemed incorporated by that Amendment. In this instance, that common (though technically imprecise) practice will be followed, and all references in this opinion will be to the First Amendment.

*Defendants' Alternative Motion for JNOV or New Trial*[2]

Each side has produced a one-sided version of the facts presented to the jury—sort of a variation on the story of the six blind men and the elephant or, to move from fable to the more modern medium of the cinema, the classic Japanese motion picture *Rashomon*. But there is a sharp difference in the extent to which such dramatically opposite perspectives are now to be credited. Now the jury, presented with two diametrically opposed scenarios, has chosen to credit one of them.

That calls for very different standards of review here: At this point the question is not how this Court would have resolved the factual issues if left to its own devices, nor is the question whether this Court finds itself in substantial agreement with the jury's resolution of those issues. Instead this opinion turns to the quite different criteria to be applied to defendants' multipart motion.

### 1. Judgment Notwithstanding the Verdict (JNOV)

Both litigants essentially agree on the test for this Court's overturning the jury's verdict entirely by granting JNOV. In *Cygnar v. City of Chicago*, 652 F.Supp. 287, 289–90 (N.D.Ill.1986) this Court quoted at length from the articulation of the standard in *Van Houdnos v. Evans*, 807 F.2d 648, 650 (7th Cir.1986)—a standard tersely summarized in the language *Van Houdnos* quoted from *Benson v. Allphin*, 786 F.2d 268, 279 (7th Cir.), *cert. denied*, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986):

The standard for granting a directed verdict is very generous to the nonmovant. And since *Cygnar* our Court of Appeals has reconfirmed the generosity of that standard (see, e.g., *Collins v. State of Illinois*, 830 F.2d 692, 697–98, 704–05 (7th Cir.1987)).

It is unnecessary to rehearse the evidence in any detail to show defendants were not entitled to the equivalent of a directed verdict—the identical standard applicable to a JNOV motion. Defendants' factual presentation, though it might perhaps have moved this Court (had it been the trier of fact) to a finding in defendants' favor, does violence to the reasonably-favorable-inferences principle stated by the very authorities defendants invoke. Their motion for judgment notwithstanding the verdict must be and is denied.

### 2. New Trial

■ Here the test is whether the jury's verdict is against the clear weight of the evidence—what *Cygnar*, 652 F.Supp. at 290–91 characterized as "somewhere in between the judgment n.o.v. test and a straight second-guessing of what the jury has done." Nothing post-*Cygnar* modifies that "against the clear weight" criterion in any respect, and the following discussion therefore applies that standard.

Fleming Mem. 2–9 (a copy of which is attached as Appendix A to avoid the need for this Court's restatement of the proof) details the evidence that the jury heard and was entitled to credit if it wished to do so. Though Fleming's version also has the vice of one-sidedness, it was not beyond the ken

---

**2.** Because rules are meant to be complied with rather than broken (or even bent), a tactic employed by defendants' counsel in the briefing process bears brief mention. Our District Court has a 15-page limit on legal memoranda (General Rule 9(d)), though this Court regularly grants waivers of that limitation on counsel's request. Defendants' opening post-trial memorandum in support of their alternative motion ran 15½ pages, and Fleming's response was 15 pages long. But defendants' reply memorandum followed the double technique of (1) diminishing the interline spacing so that as many as 40% additional typewritten lines were squeezed onto a page of text and (2) relegating blocks of textual material to single-spaced footnotes. Defend-

ants' resulting product—a nominal 12-page memorandum—would likely have been a legitimate 18 to 20 page effort. Although much of what defendants labeled "reply" was really a reassertion of the arguments in defendants' original memorandum, and although such an extended reply meant defendants had over twice as many pages to make their arguments as did Fleming, the more forthright procedure would have been to prepare the memorandum in the conventional way and ask leave to exceed 15 pages. Our Court of Appeals has criticized—and even penalized—lawyers for virtually identical tactics (*Westinghouse Electric Corp. v. NLRB*, 809 F.2d 419, 424–25 & n.* (7th Cir. 1987)).

of the jury to resolve the factual questions in his favor just as Fleming has done in his summary.

Without seeking to emphasize certain pieces of evidence at the expense of others,[3] this Court will say the jury did not exceed its rightful province when it apparently refused to credit Fakroddin's story of his not having gotten a *very* early line on Fleming's Orchard Road complaints and of his not having identified Fleming from the start as a prime prospect to be eliminated from the Highway Department. What Fakroddin testified to in both those respects was wholly at odds with his almost immediate use of Mary Jane Landreth as a record-builder of Fleming's claimed deficiencies. And a permissible jury inference from such a perceived lack of credibility on Fakroddin's part was that he was also not telling the truth when he said he was really unconcerned with Fleming's First-Amendment-protected criticism of the Orchard Road Project.

Though Fakroddin's totally insensitive handling of Fleming[4] is not of course independently probative of Fakroddin's motives for having imposed Fleming's suspensions and for having taken the ultimate adverse step of firing Fleming, the jury could have viewed that insensitivity as also discrediting Fakroddin's account of *why* he did what he did. This Court charged the jury carefully as to what hurdles Fleming had to overcome in the "but-for" sense to prevail under Section 1983. It will not second-guess the *jury's* application of the correct legal standard to what the *jury* found to be the facts.[5]

This Court should not be misunderstood as saying the jury's resolution was the same as this Court's own would have been were this a bench trial. Rather this Court's respect for the allocation of roles between judge and jury makes the Fleming Mem. 10 quotation from *Collins,* 830 F.2d at 705 (citation omitted) highly apropos in that regard—even though it addressed a JNOV motion and not one for a new trial:

> Plaintiff's evidence offered to establish her prima facie case of retaliation also was applied to show that defendants' explanations were pretextual. The jury was thus presented with the question of whether plaintiff's transfer was a consequence of her filing grievances and complaints against defendants or whether the timing of the transfer was merely coincidental and the transfer was in fact motivated by legitimate management reasons. Although the jury might have been entitled to decide otherwise, the jury was entitled to find retaliation because we believe there was substantial evidence of retaliation.

### 3. Evidentiary Rulings

■ Defense counsel persist in a mischaracterization of this Court's efforts, during the trial, to insulate the jury from testimony as to the validity or invalidity of Fleming's expressed concerns about the integrity of the Orchard Road Project. Firings of employees for their exercise of First Amendment rights are equally prohib-

---

3. That decision, after all, is for the jury to make.

4. In that respect the prime example was Fakroddin's conduct in imposing the makework assignment for Fleming to travel to the universities and highway departments and to write detailed reports on those visits—a real indignity for such a senior employee, if not for a raw recruit.

5. As they do in other respects during the briefing, defendants really defeat themselves by the argument they make in this respect. Their R. Mem. 5 says:

> The fact remains, that where a series of events may be consistent with both an impermissible motive and a permissible motive, the Plaintiff is not relieved from meeting its burden of proof that it was the impermissible motive that caused Fakroddin to terminate Plaintiff.

> Mere consistency of such events with an impermissible motive does not prove such motive. Neither may the unproven assumption that corruption had occurred be used to select the impermissible motive over the permissible motive.

But what defendants ignore is that unconstitutional motives are rarely acknowledged openly, so the trier of fact must perforce rely on circumstantial evidence—on drawing inferences from what defendants term "a series of events" and other relevant evidence. Defendants' mere disagreement with the jury's resolution of conflicting inferences (or even the fact that this Court might also disagree with that resolution) does not mean the case should be retried.

ited whether the employees' grievances are well-founded or groundless. Introducing the jury to the merit or lack of merit in such grievances therefore risks muddying the waters: It can permit the jury's decision to be overly influenced (improperly) by that consideration, rather than focusing (properly) only upon what motivated the decisionmaker to do the firing.

▮ In this case the public official doing the firing—Fakroddin—was not the one who was allegedly involved in what Fleming claimed were the Orchard Road improprieties. Fakroddin had no personal stake in justifying the Orchard Road handling. That being so, a showing that any actual impropriety had taken place would not be probative that Fakroddin's discharge of Fleming was retaliatory, because Fakroddin (as a non-miscreant) would presumably have had no motive to get back at Fleming, the whistleblower. For that reason it would have been improper to present to the jury evidence that what Fleming saw as smoke was actually indicative of real fire.

On the other side of the coin, except perhaps to the extent Fakroddin had testified (for example) that his awareness of the total baselessness of Fleming's complaints caused him to conclude that Fleming was a total flake incapable of doing his job, the evidence defendants sought to inject into the case about the lack of merit of Fleming's complaints was really beside the mark. But Fakroddin—the man who actually did the firing—expressly did *not* ascribe any significance to the evaluation of the merits of Fleming's Orchard Road charges. On the contrary, Fakroddin's testimony wholly dissociated him from that

subject, distancing himself as far as he could from the matter. Fakroddin's version was that he did not view that topic as of any concern to him either way.

Defendants really give the game away when they explicitly recognize that the kind of evidence they have identified (Defendants' Mem. 12–13 n. 3) would have had to be accompanied by "appropriate cautions by the Court" (*id.* at 12).[6] That was because such evidence was flat-out irrelevant—or if it did have any potential marginally probative value, that value would have been substantially outweighed by its unfair prejudicial effect on Fleming (Fed.R. Evid. 403).[7]

▮ Defendants' other evidentiary objections suffer from the same flaw. Because *Fakroddin* made the firing decision, the views and evaluations by other employees of Fleming's merits and demerits as an employee—unless of course those views were communicated to Fakroddin—were totally irrelevant. Usually that kind of line is a blurred one, because usually the tenures of the fired and firing employees are concurrent. In that circumstance the same flaws perceived by employees other than the decisionmaker would likely be seen by the decisionmaker too, so there might be less reason to exclude testimony by those other employees.

In this instance, though, Fakroddin was a latecomer to the scene, and his testimony specifically identified just what input from others, as well as just what personal observations on his part, served as grist for his mill. This Court's rulings permitted other employees to corroborate Fakroddin's testimony in those respects.[8] But what was

---

6. Among the jury instructions, acknowledged as correct statements of the law by defense counsel, were those reproduced in Appendix B. Notations in writing on one of the instruction pages were made by the jurors during their deliberations.

7. It is worth noting that the entire Barrett investigative report rejecting Fleming's complaints *was* in fact before the jury—and the jury was fully aware from Assistant States Attorney Barrett's testimony and other evidence that Fleming's complaints had been found unwarranted after investigation. As the Appendix B instruc-

tions reflect, the jury was also aware—with defense counsel's concurrence—that the issue for its determination was Fakroddin's motivation, and not the validity or invalidity of Fleming's perceived grievance.

8. Contrary to the suggestion at Defendants' Mem. 14, the testimony at trial was not circumscribed by what Fakroddin referred to in his deposition—though that type of limitation might indeed have been quite reasonable, given the closer proximity (and presumably the opportunity for more accurate recollection) of that deposition to the actual events than was Fakrod-

*not* allowed was testimony by other Highway Department employees as to *their own* views of Fleming that never found their way to the eyes or ears of decisionmaker Fakroddin—testimony that could have had no role in the trial other than to prejudice the jury against Fleming on grounds that were not, and could not have been, the basis for Fakroddin's adverse action.[9]

### 4. Damages

■ Though defendants are certainly not entitled to win the case in the face of the jury's having decided otherwise, and though no new trial is called for simply because of the jury's having ruled in Fleming's favor, defendants are correct as to the excessiveness of the damage award to the extent that it addressed Fleming's claimed intangible harms. This Court reviewed the relevant case law on that subject in *Cygnar*, 652 F.Supp. at 291, 299–300. Once again no post-*Cygnar* developments have altered the conclusions reached in that discussion (see, e.g., *Rakovich v. Wade*, 819 F.2d 1393, 1399 (7th Cir.1987)). This Court finds *Knapp v. Whitaker*, 757 F.2d 827, 847 (7th Cir.), *appeal dismissed*, 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985) (relied on at Fleming Mem. 13) presented a totally different situation, one that does not sanction the jury's $120,000 award for emotional harm here.

After a careful review of all the evidence, this Court determines that $120,000 is "grossly excessive" (*Rakovich*, 819 F.2d at 1399) and that no more than $40,000 at

the very outside can be supported as a measure of Fleming's recovery for emotional harm. As this Court did in *Cygnar*, 652 F.Supp. at 300, it grants defendants' motion for a new trial (limited solely to damages) unless—at his option—Fleming accepts a remittitur reducing the total jury award by $80,000. Because the damages issue should be dealt with by the jury as a totality rather than piecemeal, the new trial—if Fleming does not accept the remittitur—will extend to *all* components of the damage award, and not just to the emotional harm element.

### 5. Cost of Transcript

■ Just a few days after defendants filed their post-trial motions, Fleming moved "pursuant to Local Rule 45(b) for entry of an order directing that defendants shall pay as part of the taxable costs in this case, and in advance of its being incurred in this instance, plaintiff's expense in obtaining a stenographic transcript of trial proceedings." This District Court's General Rule 45(b) does not literally apply here—it refers to expense incurred "in necessarily obtaining all or any part of a transcript for use in a case, for purpose of a new trial, or amended findings, or for appeal...." Fleming's response to defendants' post-trial motions was none of those.

Even apart from the question whether the expense *could* be awarded under General Rule 45(b),[10] the situation here would not appear to call for the requested award. When Fleming's motion was filed, defend-

---

din's trial testimony. Quite the contrary procedure was followed at trial: Fakroddin was allowed on voir dire to identify what he recalled and whom he recalled speaking to, and others were then permitted to testify about what they had told Fakroddin.

9. That was especially, though not exclusively, true as to "testimony relating to pre-March 1, 1984 (or October 1983) inadequacies and incidents involving Fleming" (Defts. Mem. 15)—matters that occurred before Fakroddin arrived on the scene and that were never related to him.

10. Costs taxable in favor of a prevailing party are defined by 28 U.S.C. § 1920 ("Section 1920"), which refers in part to "Fees of the court reporter for all or any part of the stenographic

transcript necessarily obtained for use in the case" (Section 1920(2)). *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, — U.S. —, 107 S.Ct. 2494, 2497, 2499, 96 L.Ed.2d 385 (1987) teaches Section 1920 marks out the boundaries for taxable costs (see also *Farmer v. Arabian American Oil Co.*, 379 U.S. 227, 235, 85 S.Ct. 411, 416, 13 L.Ed.2d 248 (1964)). Of course no District Court rule can *alter* a statutory limitation, so General Rule 45(b) must be viewed as an effort to define what is "necessarily obtained" within the meaning of Section 1920(2). That construction might create the negative inference that an item not coming within General Rule 45(b) could not qualify under Section 1920(2). For the reason next explained in the text, however, this opinion is not called upon to decide that question.

ants had already tendered their motion and supporting memorandum (including its references to the trial testimony). There seems to be no good reason for Fleming's counsel not to have requested the use of the transcript copy from defendants' counsel—after all, the latter had no apparent need to use the transcript in dealing with the legal motion they then had to answer, so they could presumably have accommodated such a request. Absent Fleming's showing of such a request and a consequent refusal, this Court will not hold the obtaining of the extra copy of the transcript was "necessary."

## Fleming's Claims

So much, then, for the post-judgment relief sought by defendants and the related transcript cost claim by Fleming. On the obverse side of the coin, Fleming is dissatisfied with the scope of his victory to date. What he seeks are three additional forms of relief:

 1. amendment of the judgment to direct that County purge his personnel file by removing any derogatory information;

 2. addition of prejudgment interest on the portion of compensatory damages reflecting Fleming's lost income from employment; and

 3. award of attorney's fees under 42 U.S.C. § 1988 ("Section 1988").

Like defendants with their motions, Fleming is successful only in part.

## 1. Purging of Fleming's Employment File

■ At the threshold it should be noted Fleming faces no procedural barrier to the relief he asks. Judgment was entered October 22, 1987, so Fleming's November 2 motion was timely under Rule 59(e) as read in light of Rule 6.

In substantive terms, however, Fleming asks more than he merits. Though the jury found in his favor that his First Amendment exercise was a procuring cause of his firing, that provides no justification for his own conduct toward Fakroddin. Unlike *Knapp*, 757 F.2d at 844, relied upon by Fleming, this is not at all a case in which the jury could reasonably have found trumped-up charges against a blameless employee—far from it. Fleming was plainly guilty of reprehensible behavior toward Fakroddin, and this Court cannot in good conscience wipe the slate clean in that respect.

Defendants also point out accurately that Fleming had never asked for such equitable relief—in his pleadings, in the final pretrial order ("FPTO"), in his trial brief or at trial. Moreover, Fleming wisely waived any claim for loss of reputation at the beginning of the trial.[11] Whether viewed from the perspective of waiver or simply from the lack of equity in Fleming's position, Fleming has no justifiable call either on this Court's judgment in law or on the conscience of this Court sitting as a chancellor. Like Macbeth's "vaulting ambition," this prayer for whitewashing on Fleming's part "o'erleaps itself and falls on th' other [side]."

## 2. Prejudgment Interest

■ Again Fleming presents this Court with an afterthought. Despite the care with which his case was prepared and tried, there was not even a whisper of a claim by him to recover the present value of the dollars he assertedly lost in the form of past salaries—again a claim totally omitted from the successive versions of his Complaint, from the FPTO, from his trial brief, from the detailed exhibits (and several revisions) he provided to reflect his claimed damages for lost salary and lost investment income and, finally, omitted from the verdict forms themselves.

Once more defendants urge waiver. Over and above the generalized concept of

---

**11.** If Fleming had kept that claim in the case, the door would have been opened to the admission of extensive adverse evidence as to his reputation and conduct before Fakroddin came on the scene—evidence that forms the basis of one of defendants' already-dealt-with arguments. With a loss-of-reputation claim at issue, the relevance considerations as to such evidence would have been entirely different (let alone the results of this Court's balancing process under Fed.R.Evid. 403).

Fleming's having omitted the claim from his detailed and particularized presentation of damages to the jury, defendants refer to specific directives in the FPTO (part of this District Court's General Rule 5.00):

> 1. Trial briefs are expressly "intended to provide full and complete disclosure of the parties' respective theories of the case" (FPTO n. 11).
>
> 2. Even more directly on point, "Any theory of liability or defense that is not expressed in a party's trial brief will be deemed waived" (*id.*).

That last factor has special force here. Not only does Fleming now (and for the first time) ask for interest, but he also seeks to invoke the 28 U.S.C. § 1961(a) *post* judgment standard for the *pre* judgment period in calculating such interest. Had the issue been posed to the jury as it should have been, each side would have had the opportunity to present its own view of the matter for resolution by the factfinder. What Fleming belatedly shoots for is the better of both worlds: the jury's decision rather than this Court's on the propriety of his recovery of back pay all the way up to the time of trial,[12] and this Court's decision rather than the jury's on the propriety of his receiving interest on that award and as to the rate of such interest.

Both aspects of Fleming's prejudgment interest claim are problematic at best. Though defendants' brief response does not make this point (and Fleming obviously does not), it is open to serious question whether he should get prejudgment interest at all.[13] And even if the answer to that question were "yes," in fairness Fleming rather than defendants should suffer the risks of his total failure of proof on the proposed measure of interest.[14]

To be sure, *Williamson v. Handy Button Machine Co.*, 817 F.2d 1290, 1298 (7th Cir.1987) confirms the availability of prejudgment interest under Rule 54(c), even post-verdict and even without a prayer for such relief in the pleadings. But *Williamson* did not address the express waiver situation specified by this District Court's rules. For that and the other reasons posed by the circumstances here, neither *Williamson* nor such cases as *Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417, 1425–26 (7th Cir.1986) supports Fleming's newly-advanced effort. Prejudgment interest will not be awarded.

---

12. This Court would have taken a substantially more jaundiced view than the jury did of Fleming's intention to remain on active duty up to the time of trial. However, that difference of opinion does not of course justify substituting this Court's view for the jury's via a remittitur (or, a fortiori, via a new trial or JNOV).

13. Fleming has already been compensated in the damages award, as presented by his own damage exhibit and accepted by the jury, for the fact that he had to liquidate his invested funds to provide him with dollars needed for living expenses—dollars that would have been generated by his continued employment income had he stayed in the work force. If damages are viewed (as they should be) as a means of putting a plaintiff in the same position as if the wrong had not been done, it must be recognized that Fleming's situation as a continuing employee would very likely have been this:

> 1. His investments would presumably have remained intact, because he and his wife would have had his salary to live on. That would have given him the yield on that intact investment.
>
> 2. At least a substantial part of his salary would surely have been used for living expenses.
>
> 3. Only what remained unspent out of his salary (if anything) would have been available as savings, capable of providing a yield by way of interest.

It should of course be emphasized that all this (especially the last item) is quite speculative, and any failure of proof (rather than surmise) has to cut *against* Fleming, who had the burden of proving his damages. But even apart from that problem, the jury's verdict has already given Fleming the benefit of the first factor: His exhibit calculated, and the damage award included, the entire loss of yield caused by his need to invade the investment prematurely. That being so, it would seem any award of prejudgment interest on the lost salary—which would implicitly treat that *entire* amount as remaining intact—would create a double recovery.

14. This Court awarded prejudgment interest at rates much like those for which Fleming contends in *Makhija v. DeLeuw Cather & Co.*, 666 F.Supp. 1158, 1176 (N.D.Ill.1987). But *Makhija* was a bench trial, so this Court was making all the factual as well as the legal determinations on the evidence tendered by the parties.

### 3. Attorney's Fees

Fleming's remaining motion stands on a different footing from the others. Though Section 1988 literally speaks in purely permissive terms as to the awardability of attorney's fees as part of the costs allowable to a prevailing party, familiar judicial gloss on the statute (see *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed. 2d 40 (1983)) makes such an award to the winning plaintiff pretty much automatic absent extraordinary circumstances. This Court finds no such totally disqualifying factor at work here. Thus the question is not really "whether" but "how much."

Fleming's lawyers have not asked for a multiplier to be applied to what they characterize as the lodestar amount of $232,-403.75. Even though that amount is almost a dollar-for-dollar match to the jury award of $237,574.19 (before this opinion reduced Fleming's potential recovery by $80,000 from what the jury had initially awarded him), *City of Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) has now made clear that the amount of the actual damage award to plaintiff does not circumscribe the fee award, so long as the latter is otherwise reasonable. This opinion must then decide (1) the reasonableness of Fleming's lawyers' respective hourly rates, (2) the reasonableness of the time spent by those lawyers and (3) the reasonableness of the time multiplied by those hourly rates to produce the fee award for presenting Fleming's case.

### A. Hourly Rates

Fleming's lawyers correctly say historical billing rates are not the fair measure of recovery of attorney's fees, but they miss the real reason those rates are not. This is not intended to fault counsel particularly, because for some reason courts seldom examine and articulate the proper rationale for what they do in this area. Indeed, sometimes courts really do the wrong thing because they themselves have not thought the matter through. That cannot be said, however, of Judge Wood's opinion for our Court of Appeals in *Ohio–Sealy Manufacturing Co. v. Sealy, Inc.*, 776 F.2d 646 (7th Cir.1985), which as part of its extended discussion of fee-related issues has dealt constructively with a number of factors relevant here.

As with an award of damages, the purpose of not looking to unadjusted historical billing rates is (or at least should be) to put the lawyers in the same position they would have occupied had they not been required to wait for payment until funds became available at the very end of the litigation. That is really nothing more than a function of the loss of the use of money (it will be remembered that interest rates reflect the free market's combination of the pure cost of money and the element of inflation, so that applying an appropriate interest calculation to delayed receipts takes both those factors into account; see *Ohio–Sealy, id.* at 663 & n. 17).

Courts do frequently look to current billing rates in making fee awards (see, e.g., *Lightfoot v. Walker*, 826 F.2d 516, 523 (7th Cir.1987); *In re Burlington Northern, Inc.*, 810 F.2d 601, 608 (7th Cir.1986), *cert. denied*, —— U.S. ——, 108 S.Ct. 82, 98 L.Ed.2d 44 (1987)). But whenever they do that, courts should be keenly aware that such an approach is no better than a rough and ready (albeit often a highly convenient) surrogate for a more precise measure: the present value of what counsel would have collected but for the delay in billing. Numerous factors may make the use of current rates a distorted measure of the proper recovery. For example:

1. To the extent that increases in hourly rates outstrip the intervening interest rates (which, as already stated, should reflect both inflation and the pure cost of money), lawyers are more than made whole by the use of current rates. In this instance the five lawyers involved show these differences in hourly rates between the initial historical rates and the rates now sought to be collected from defendants:

| Lawyer | Original Rate | Rate Claimed | Percentage Increase | Time Period |
|--------|--------------|--------------|---------------------|-------------|
| Brooks | $100 | $135 | 35% | 2½ yrs. |
| Katz | 80 | 120 | 50% | 2½ yrs. |
| Heap* | Not stated | 120 | — | Not stated |
| Adams | 80 | 100 | 25% | 2½ yrs. |
| Wyeth | 80 | 100 | 25% | 2½ yrs. |

* As a 1983 law school graduate, Heap had no more than four years' experience by the end of the trial. Adams and Wyeth were even less experienced, each having graduated from law school in 1984.

2. If a lawyer becomes involved in a matter quite early in his or her career, later increases in that lawyer's hourly rates are primarily reflective of the lawyer's increased experience rather than the delay factor that should be the court's only concern (see *Ohio–Sealy*, 776 F.2d at 663). Of course the *current* services of that lawyer may (and should) be billed at current rates to reflect their greater market value (in part a function of greater experience), but it would be a serious distortion to elevate *all* that lawyer's charges to the current rate. Here, for example, three of the five lawyers (Heap, Adams and Wyeth) even now have only three or four years' experience, having graduated from law school in 1983 or 1984. There is no justification whatever for applying today's rates to services they rendered when they were even fresher to the profession.

3. Along lines related to the last point, when a lawyer becomes a partner there is frequently a meaningful increase in his or her hourly rate—a reflection of the lawyer's greater responsibility as well as of the increased level of experience and market value just discussed (and recognized by the elevation to partnership status). Here Katz' affidavit reflects she became a partner in June 1985, and her hourly rate quickly increased from $80 to $100, a 25% jump (the affidavit is unclear as to whether that took place immediately or later in 1985). Again no legitimate reason exists for charging defendants at the higher rate for Katz' services as an associate, when the firm's paying clients would not have been so charged for contemporaneously billed services.

4. One factor this Court has never seen discussed in the cases—perhaps because acting as a senior billing partner in a law firm is not part of the universal pre-judicial background of federal judges—is the proper measure of the delay period and how that interacts with hourly rates. No law firm, of course, bills clients for services instantaneously upon their rendition: Bills are typically rendered monthly at best, and often less frequently—quarterly or sometimes even annually. When clients are not in a position to pay fees as they go, it is not at all unusual for lawyers to defer collection by agreement—sometimes even to the end of the matter for which they have been retained.[15] Where lawyers' regular billing practice in comparable matters for their paying clients involves any element of delay, that has not customarily been coupled with a charge to the client for the lost use of the dollars involved. Assuredly no basis exists for such a charge for the interval between the rendition of services and rendition of the bill. And as for the interval between rendition of the bill and its payment, the historical view of law as a profession and not as a business actually made it unethical, at least until the 1970s, even to *agree* on

15. This is entirely apart from the different situation of a purely contingent fee, in which any payment at all is conditional upon success and the fee is almost always based on a percentage of the recovery. It is well established that contingent fee arrangements do not control awards where (as under Section 1988) the prevailing plaintiff has a statutory right to fees (see, e.g., *Hagge v. Bauer*, 827 F.2d 101, 110–12 (7th Cir. 1987)).

the charging of interest.[16] And at least while this Court was still in the practice of law (though the 1970s), bills were always rendered at the hourly rates applicable when the services were provided, not at the lawyers' current rates if those were increased in the interim. No evidence has been introduced here bearing on the various facets of this factor, though it is not wholly irrelevant that Fleming and his attorneys entered into a retainer agreement (P. Motion Ex. A) that provided for current monthly billing and payment in these terms:

> 3. I agree to pay each monthly statement when I receive it. If payment therefor is overdue by more than thirty (30) days, finance charges of one and one-half per cent (1.5%) per month shall be due and owing on any unpaid balance from the date of first billing.
>
> 4. The fee basis shall be hourly, with attorney time to be billed at a flat rate of $20.00 per hour, that being one-fourth of the primary attorney's customary billing rate. It is agreed and understood that if I prevail upon my civil rights claim(s), my attorneys will apply to the court for an award of costs including attorney's fees under 42 U.S.C. § 1988. Upon receipt of any such award, they will reimburse me therefrom for the amount of fees and costs I shall then have paid to the Firm in connection with this matter, except that the reimbursement shall not in any event exceed the amount of said § 1988 award.... I understand and acknowledge the potentially protracted nature of the contemplated litigation, and state that the foregoing arrangement is in consideration of the Firm's undertaking to represent me in same and is intended to provide partial compensation to the Firm for its service during the course of said matter.

■ These are simply some, though not necessarily all, of the factors demonstrating the impropriety of applying current rates, as Fleming's lawyers would have this Court do. It is equally true that Defendants' Response 1–2, which calls for an award based on unadjusted historical rates, understates the proper calculation. This Court lacks the necessary input to make the required determination now, but it announces the following holdings:

> 1. Actual regular billing rates for each of Fleming's lawyers at the respective times the services were rendered were in fact the reasonable prevailing rates for those lawyers. Those rates will prevail over the much more generalized information contained in the supporting affidavits of Charles Boyle and John Murphey submitted with Fleming's motion.
>
> 2. Adjustment to the rates referred to in Paragraph 1 will take the form of adding interest at the prime rate from a date 30 days after the end of the month in which the services were rendered (that reflects the normal billing time for the hypothetical paying client) to October 22, 1987.[17]

These principles, coupled with the adjustments provided for in the following sections, should be the basis for the revised fee submission called for in this opinion.

### B. Time Spent

Defendants interpose two types of objections to the time expenditures claimed by Fleming's attorneys:

> 1. Time devoted to certain claims is sought to be excluded altogether.
>
> 2. Other time is said to be excessive and therefore noncompensable.

Each criticism will be dealt with in turn.

### (1) Exclusion of Claims

■ First, Fakroddin's defamation counterclaim does not come within the con-

---

16. Thus no bills in the legal profession (or even the law "business") were then permitted to read (say) "Net 30 days—1% per month thereafter." That has now changed.

17. To simplify matters by avoiding individualized month-by-month calculations, it will be ac-

ceptable if each calendar year's services were totalled, with the year's average (or weighted average) prime rate then being applied to the year's total allowable fees from a single date in that year (July 31 in each instance).

cept that a successful Section 1983 plaintiff may also recover for related claims even though they were unsuccessful (see, e.g., *Lenard v. Argento*, 808 F.2d 1242, 1245–46 (7th Cir.1987); *Zabkowicz v. West Bend Co.*, 789 F.2d 540, 551 (7th Cir.1986)). To be sure, the defamatory statements Fleming admittedly made were part of the reason that Fakroddin assigned for his actions toward Fleming, and it is also true that if Fakroddin had won on his counterclaim, his net liability to Fleming would have been reduced. That, however, would have been equally true of a successful Fakroddin counterclaim on a promissory note or other totally unrelated obligation. Fleming's arguments in this area are really irrelevant makeweights that do not entitle him to do violence to the American Rule that litigants —whether successful or unsuccessful— generally bear their own legal expense.

■ Second, defendants are also not to be saddled with Fleming's pendent Count II claim for retaliatory discharge under state law. *Zabkowicz* properly included a related pendent claim within its Section 1988 award, but under totally different circumstances. In this case even minimal research would have revealed the state law claim was "destined to fail" (cf. *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985) (stating the Rule 11 standard)) because Fleming had not served the notice then required under the Local Governmental and Governmental Employees Tort Immunity Act, Ill.Rev.Stat. ch. 85, ¶ 8–102 (now repealed). Though the claim was not sanctionable under Rule 11, it was sufficiently ill-conceived so that Fleming rather than defendants should pay the bill.

### (2) Excessive Time

■ As for the individual lawyers' time, defendants have made a thoughtful effort to carve away duplicative and excessive time charges. Some nonproductive time may be implicit in the lawyering process, but a number (though by no means all) of the matters singled out by defendants represent justifiable exclusions:

1. Heap's time cannot be supported as recoverable. Because of his late entry onto the scene, much of what he did was inherently duplicative—simply bringing himself up to speed in the case. Even more fundamentally, the lawyers already in place should have been competent to handle the case (and indeed they proved themselves to be—particularly Katz). That after all is why they are entitled to charge the hourly rates they do.

2. Substantial other time represented self-education that should have been wholly unnecessary. Again a principal reason for the hourly rate differential between fledgling and experienced counsel is because the latter are expected to bring know-how to a matter, not to inform themselves at the opponent's expense.

3. Still other time is duplicative on the face of things. This Court has gone through the challenged entries (Appendix B to defendants' response) with care. It seems plain that much if not all of the time defendants complain of must be disallowed. But plaintiff's Reply Memorandum is not responsive in enough detail to permit an item-by-item ruling. It appears that such handling will be counterproductive from everyone's point of view —the litigants' and the court's. Counsel are urged to seek an agreed resolution of the matter to obviate the need for an evidentiary hearing.

### C. Reasonable Fee

Familiar usage characterizes the product of hours times hourly rate as the "lodestar"—the starting, but not necessarily the finishing, point for a determination of reasonableness. Fleming's counsel properly do not seek the application of a multiplier or enhancement factor to the lodestar. This Court concludes the lodestar figure, as modified by the already-discussed downward adjustments, *is* the reasonable fee to be awarded under Section 1988. Counsel are directed to confer promptly in an effort to reach agreement on an amount conforming to this opinion. Failing such agreement, further submissions will be required.

This matter is set for a status report April 27, 1988 at 9 a.m. to discuss the subject.

### D. Fakroddin's Counterclaim

At the close of Fakroddin's case in chief on his defamation counterclaim, this Court granted Fleming's motion for a directed verdict. It ruled the complained-of remarks by Fleming were expressions of opinion and hence nonactionable.

Fakroddin's separate counsel who handled the counterclaim have filed a motion for new trial. This Court has considered all their arguments and adheres to the conclusion it has already reached and expressed orally in dismissing the claim. There is no need to repeat either the analysis in that oral ruling or the persuasive (and more extended) discussion at pages 4–10 of Fleming's memorandum in opposition to Fakroddin's motion. Fakroddin's motion is denied.

### Conclusion

Defendants' motion for JNOV or, alternatively, for a new trial is denied with one exception: If Fleming does not accept an $80,000 remittitur, a new trial will be granted as to all components of the damage award (but not as to defendants' liability). Fleming's related claim for payment of the cost of transcript is denied.

Fleming's motions for post-judgment relief are denied with one exception: that seeking an award of attorney's fees. In that latter respect, a status hearing is set for April 27, 1988 at 9 a.m. to discuss the implementation of this opinion.

Fakroddin's motion for a new trial is denied.

### APPENDIX A

Entry of judgment notwithstanding the verdict would be improper, considering the proof received in this case and "demanding standard" which JNOV movants must meet, *McKinley v. Trattles,* 732 F.2d 1320, 1324 (7th Cir.1984). Even under the more lenient standard for new trial, which asks whether the verdict is against the clear weight of the evidence, *Cygnar v. City of Chicago,* 652 F.Supp. 287 (N.D.Ill.1986) (appeal pending), defendants' bid to avoid this jury's decision should fail.

Though they purport to assay the record as favorably as possible to plaintiff (Defts' Mem. 4), defendants skip mentioning most of the evidence available to the jury on the issue of whether plaintiff's protected speech activities were a substantial or motivating factor in his discipline and firing. Specifically, they slight the significance of the entire chronology of events from October 1983 to June 1984, as those events were narrated at trial in relation to one another. Testimony developed the nature of plaintiff's Orchard Road whistleblowing activities which started eight months before he was fired. (Fleming testimony, October 5 and 6) Further, that at the time they began, plaintiff had been employed as Assistant Highway Superintendent for 15 years, had received satisfactory performance increases annually (as he did again in late 1983) and had a clean personnel record. Further, that the county officials to whom plaintiff had by mid-January 1984 expressed his concerns about the borrow pit switch included then-Highway Superintendent William Carter, Transportation Committee Chairman Bennett Shoop, and Assistant State's Attorney William Barrett (assigned by State's Attorney Morrow to investigate Fleming's charges), all of whom had by mid-February refused requests by plaintiff to discuss the matter, and at least two of whom (Carter and Shoop) had conferred several times for various purposes, singly or in groups, with incoming Superintendent Fakroddin before he arrived on the job March 1st. Fakroddin himself was aware of plaintiff's Orchard Road criticisms by that date, if not sooner. (10/5, 10/6 Fleming; 10/13, 10/14 Fakroddin)

Even as he assured Highway Department employees that they all had "clean slates", Fakroddin had the Department's bookkeeper Mary Jane Landreth begin keeping a special record of plaintiff's activities almost immediately. The first entry in the so-called "Landreth diary" bore the date March 1. Fakroddin made no effort in his first few days at work to get ac-

quainted or talk shop with Fleming, senior employee in the Department and his ostensible right-hand man. He declined two lunch invitations from Fleming in that period and refused to speak with him on the subject of Orchard Road, commenting that the matter was in "legal hands".[1]

On March 7th, Fakroddin summoned Fleming to their first meeting, held in the Department conference room, stationing Mary Jane Landreth there as third-party witness/recorder. He then read to Fleming a statement, prepared in consultation with William Barrett, beginning with the words "I recognize that you have been in this Department for many years ... and during that period of time you disagreed with many policies and practices". The "oral reprimand" continued for two typed pages, assailing Fleming's management capabilities and instructing him to travel hundreds of miles to "personally visit" five universities to investigate management and human resource courses. It also directed Fleming to visit five highway departments for the purpose of analyzing and reporting back on their organization, operational practices and costs.

The evidence further showed the March 7th reprimand to be the first salvo in a barrage of adverse job actions against plaintiff, characterized by the defense as an exercise in "progressive discipline" which also included:

—Fleming's first-ever suspension from work, meted out by Fakroddin on April 9th (accompanied by the frank admission that "What disturbs me the most is your desire to talk only about Orchard Road ...");[2]

—an April 25th "Disciplining Writeup" based on an allegation that Fleming disarranged the desk of co-worker David Grupe.[3]

—a second suspension from work, this time without pay, based on alleged inadequate reports by Fleming concerning his travels.[4]

The "progressive discipline" was crafted in close consultation at every stage with William Barrett, who was simultaneously preparing an investigatory document which would find that county officials were not guilty of any wrongdoing in regard to the Orchard Road project. Fleming's several attempts to use county grievance machinery to appeal the disciplinary measures as they were being handed down foundered, because (the Personnel Administrator told him each time) his file contained no record of the reprimands or suspensions. (10/6 Fleming)

1. There were ample indications that Fakroddin was more discomfitted by than nonchalant about Fleming's First Amendment activity. Even as he professed his unconcern to plaintiff ("that all happened before I came"), Fakroddin on March 1st or 2nd picked up the phone and called his old friend Ben Houden at IDOT to get an "update" on the Orchard Road controversy. (10/13 Fakroddin) He also told William Barrett that "every time he ran into Fleming, Fleming wanted to talk to him about Orchard Road". Barrett, who besides investigating Orchard Road was functioning as the State's Attorney's personnel relations specialist, testified to his perception that Fakroddin was bothered by Fleming's agitating and that "it was important for Fleming to know that fact". (10/8 Barrett).

2. The suspension was not lifted even after the behavior said to have occasioned the discipline —i.e., Fleming's refusal to travel on the tight schedule proposed by Fakroddin—was shown to have been medically justified, nor did Fakroddin despite knowing of Fleming's health problems relent on his insistence that Fleming perform the travel assignment.

3. Fakroddin never checked this allegation with Fleming before writing him up. Though Fakroddin claimed to have written statements supporting this accusation, he refused to show them to Fleming. Actually, the charge appears to have originated with the victim himself, who did not observe the event either and was not called as a witness at trial. An employer sincerely interested in a fair program of progressive discipline might reasonably have questioned the *bona fides* of Grupe's report, considering that (a) he was Fleming's arch-detractor (b) his work area was habitually and notoriously messy.

4. It is not clear, comparing them with his instructions to Fleming, what Fakroddin found unsatisfactory about the reports. Fakroddin did not shed much light on this point at trial, except to say he had intended for Fleming to look into two-day seminars, not courses. (10/13 Fakroddin; compare Jt. Exs. 14, 12, 10).

Meanwhile, Fakroddin had also in March taken a poll asking job class employees in the Highway Department (except Fleming and Richard Dencer) whether they would prefer to be supervised by Fleming, Dencer or "Others". All people surveyed voted for "Others".[5] Either because of the poll results or because Fleming was about to attend management courses "at a university of his choice",[6] Fakroddin also issued a new Temporary Position Control Chart for the Department which removed all Engineering Section employees from under Fleming's supervision. (Jt.Ex.5) Except for telling him to visit the universities and highway departments, Fakroddin gave Fleming no work to do from March 1 to April 17, shortly before Fleming was scheduled to leave on his travel assignments.

Defendants' lament that the jury's verdict "presents a profound and shocking miscarriage of justice" (Defts' Mem. 2) is simply blind hyperbole. The jurors were told that they need not leave their common sense and experience at the courthouse door, and they did not. They were entitled to tot up the myriad inconsistencies and implausibilities in the defense case and discount it wholesale, if that appeared in their judgment to be appropriate. Given Fleming's long tenure at the Highway Department and Fakroddin's insistence that he did not come to the Superintendency with preconceptions about Department personnel, it can be inferred that his immediate monitoring, disciplining and ostracism of plaintiff

had something to do with Fleming's whistleblowing activities—of which Fakroddin was continously aware, and which he avowedly did not welcome. The inference was strengthened by the fact that Fakroddin's counselor in the asserted campaign to "turn Fleming around" was the very Assistant State's Attorney supposedly investigating Fleming's criticisms of the borrow pit switch. It became well-nigh irresistible, bolstered by Fakroddin's express reference when disciplining Fleming to the latter's past "disagree[ment] with many practices and policies of the Department" and to his Orchard Road complaints. (Jt.Exs.4, 13–A).

Thus, there was abundant circumstantial evidence in the case that Fakroddin's actions were not "progressive discipline", but were calculated to harass, build a record on[7], and ultimately fire the chief critic of the Orchard Road project precisely because of those criticisms. Plaintiff's case was not weak because it depended upon circumstantial evidence. As the D.C. Circuit recently wrote in litigation over the alleged retaliatory dismissal of a postal worker for protected speech,

> The District Court defined the relevant issue as "the state of mind of Gordon's supervisors at the time they fired him," 603 F.Supp. at 395, and, in the absence of any direct evidence, properly looked to circumstantial evidence in resolving this issue. *See Clark v. Library of Congress*, 750 F.2d 89, 101 (D.C.Cir.1984) ("It

5. Fakroddin stood by while some of the employees completed their ballots, which required signature. He explained in one breath that he "didn't know the procedures for secret ballots", and in the next that he wanted the signatures so he could "determine who is signing for who". (10/13 Fakroddin testimony) Most of the surveyed employees had never even *been* supervised by either Fleming or Dencer, a fact which made the very point of the inquiry at least mildly suspect. One who testified that he filled the survey out in Fakroddin's presence said that "instinct told me" to select "Others" and that "it might be a problem" if he voted for Fleming. He later Fleming he was sorry he had had to fill out the ballot. (10/7 Johnson) An employee who *had* previously been supervised by and had "good rapport" with Fleming said he perceived that having a good relationship with the new Superintendent dictated that he vote for "Oth-

ers", because a vote for Fleming might signal to Fakroddin that he was not a "team player". This employee testified that he was also aware from conversations with Fakroddin that the Superintendent viewed the Fleming/Orchard Road matter as a "major headache". (10/7 Holcomb).

6. A third explanation offered by Fakroddin at trial was that although his cover memo for the chart specifically called the changes a "reorganiz[ation]," he was not really reorganizing duties but only redrawing the chart to make it square with the organizational realities he found to exist at the Department. (Jt.Ex.5; 10/13 Fakroddin).

7. As to the evidentiary value of such "record building", see *Collins v. State of Illinois*, 830 F.2d 692, 701 and n. 4 (7th Cir.1987).

is clear ... that a plaintiff need not present direct evidence ... to meet his burden of showing that protected conduct was a substantial or motivating factor in the hiring decision.")

*A.P.W.U. v. U.S. Postal Service*, 830 F.2d 294, 311 (D.C.Cir.1987); *accord, Missouri National Education Ass'n v. New Madrid County R–1 Enlarged School Dist.*, 810 F.2d 164, 167 (8th Cir.1987).

Defendants, of course, introduced evidence at trial designed to show plaintiff was a belligerent, irascible person who abused fellow employees including Fakroddin and was disciplined for cause. However, it was the jurors' province to weigh the evidence and assess credibility. In this respect, they may have been influenced by numerous inconsistencies between the deposition and trial testimony of defendant Fakroddin [8], discrepancies between Fakroddin's trial testimony and accounts of events contained in the diary from which he frequently refreshed (and corrected) his memory while testifying [9], and between the testimony of Fakroddin and other defense witnesses.[10] They may also have evaluated some parts of Fakroddin's testimony, or that of other defense witnesses, as inherently incredible.[11] Fleming himself flatly

denied most of the alleged insubordinate acts attributed to him, and as to others the evidence can reasonably be viewed as showing that Fakroddin himself provoked Fleming's outbursts intentionally [12], as he turned the screws of his so-called progressive discipline campaign even tighter.[13]

### APPENDIX B

Fleming claims that Fakroddin disciplined and fired him because of his exercise of his constitutional right to speak as a local government employee on a matter of public concern. Specifically, Fleming claims that he spoke to his superiors and to law enforcement agencies concerning possible wrongdoing in connection with the Orchard Road overpass project, and that such constitutionally protected conduct was the true reason for defendants' making a record of his activities; issuing oral and written statements to him which negatively evaluated his job performance and managerial ability and imposed various travel assignments; suspending him from work twice, once with and once without pay; and discharging him from employment.

Defendants admit issuing the statements relating to plaintiff's job performance, suspending him from work, and terminating

---

**8.** *E.g., compare* deposition testimony that he did not meet with any employees on March 1st prior to convening a staff gathering in the Highway Department conference room about 9:30 a.m. *with* 10/13 trial testimony that various workers including Mary Landreth trooped into his office that day shortly after 7:30 a.m. to tell how much they disliked working with Fleming.

**9.** *E.g., compare* Fakroddin 10/13 trial testimony (Fleming called him gutless bastard "every time he had a chance to talk with me") *with* Jt.Ex. 12 (diary entries reviewed by witness in jury's presence disclosed no namecalling until mid-April).

**10.** *Compare* n. 8 above *with* Landreth deposition testimony disclaiming any such early morning meeting.

**11.** *E.g., see* Fakroddin's 10/13 story about 1983 Springfield encounter with Fleming ("whoever the hell comes in over there better leave me alone for a year") and assertion that Fleming "gave me the finger" every time they passed each other in the hall during Fakroddin's first two weeks on job; *see also* 10/14 Robinson testimony fixing Fleming's alleged dramatically rude down-the-hall gesture to Fakroddin as hav-

ing occurred in early May while Fleming was in fact then out of town performing the travel assignments.

**12.** Right down to the end on June 7th when he seized on Fleming's half-open office door as an opportunity to renew the chafe. (Fakroddin 10/13) Considering that this was the same individual who hung back on April 26th positioned to watch Fleming's reaction on finding the "Disciplining Write-up" in his mailbox, it would not be odd if the jury adopted Fleming's version of pre-firing events rather than that of the "careful bureaucrat" (Defts' Mem. 7 n. 1).

**13.** *Cf. Williamson v. Handy Button Machine Co.*, 817 F.2d 1290, 1294 (7th Cir.1987) (Title VII action):

Williamson's breakdown led to her discharge. Handy Button played on this ... Perhaps Handy Button believed that if the jury thought Williamson crazy, it would see why Handy Button dismissed her. The risk was that the jury would conclude that Handy Button had *driven* Williamson to distraction; the jury so found.

(Emphasis in original.)

him from employment. Defendants maintain that Fleming was disciplined and discharged for failure to perform work in a professional and workmanlike manner, insubordination, and for personal attacks on the qualifications, integrity, ancestry and race of Fakroddin. Defendants further deny that any of plaintiff's complaints concerning the Orchard Road project were the reason for, a reason for, or a motivation for their actions relative to plaintiff's employment.

Fleming denies that he failed to perform work in a professional and workmanlike manner, that he was insubordinate, and that he engaged in personal attacks on the qualifications, integrity, ancestry and race of Fakroddin. He claims that the reasons given by defendants were not the true reasons for their actions against him, and that the poor relationship with Fakroddin was a result of Fleming's constitutionally protected communication of his views regarding the Orchard Road project.

In order to recover on his claim for violation of his constitutional rights, Fleming has the burden of proving the following elements by a preponderance of the evidence:

First, that defendants Fakroddin and County of Kane acted under color of state law. There is no dispute that this element is satisfied.

Second, that a substantial or motivating factor governing defendants' acts and conduct in this case was a desire to punish or retaliate against Fleming for the exercise of his constitutional right to communicate his views on the Orchard Road project. If you so find, the burden of proof on this element alone then shifts to defendants to prove by a preponderance of the evidence that they would have disciplined and discharged Fleming from employment even in the absence of Fleming's constitutionally protected conduct;

Third, that the disciplining and discharge of Fleming from his job as Assistant Superintendent of Highways was a proximate cause of damages suffered by Fleming.

For present purposes, the decisions and actions of Fakroddin are also to be considered as decisions and actions of the County of Kane.

If you find from the evidence that each of the foregoing elements of proof is satisfied, then you shall find in favor of Fleming and against Fakroddin and the County of Kane on the claim and proceed to consider the damages, if any, to be awarded to Fleming for that claim. If, on the other hand, you find that any of these elements of proof is not satisfied, you shall find in favor of Fakroddin and the County of Kane and against Fleming on his claim.

The last two elements of Fleming's claims require further amplification.

As to the second of the elements, the defendants had a right to discipline and dismiss Fleming for any reason other than his exercise of his constitutionally protected right to communicate his views on the Orchard Road project or even for no reason at all. Your decision on Fleming's claim must not be based on whether you believe defendants' decision was wise or reasonable. Rather, you are to decide in accordance with these instructions whether Fleming was disciplined and dismissed by Fakroddin for an unconstitutional reason.

Because Fakroddin has offered reasons, of course you understand you may but are not bound to accept those reasons. In determining Fakroddin's motives for disciplining and discharging Fleming, you may consider whether the reasons he has offered are or are not pretexts, that is, whether they are the reasons that actually motivated him, or whether they have been offered to justify a decision made for an unconstitutional reason.

As to the third element, when I say "proximate cause," I mean that Fleming has the burden of proving that he would not have suffered damages but for the defendants' disciplining him and discharging him from employment as Assistant Superintendent of Highways.

As you have heard, one of the issues Fleming has the burden of proving by a preponderance of the evidence has to do with the motives governing Fakroddin's acts and conduct in this case. By its very

nature, a person's motive or intent must be inferred from that person's statements, acts or conduct. Proof of motive or intent is therefore dependent upon circumstantial evidence in the same way that has previously been explained to you. Plaintiff is not required to produce direct proof of unlawful motive, intent or design.

As I stated to you at the beginning of the trial, the actual propriety or impropriety of the procedures that were followed in connection with the Orchard Road project is not at issue in this case. That is, you as the jury are not being asked to decide whether or not Fleming's charges of any wrongdoing were either true or false.

As you know, the County has denied that there was any wrongdoing on the project. Any evidence that you may have heard from either side on this subject has simply been intended as background information and—as I am sure you recognize—was not at all intended as a complete story, either from Fleming on the one hand or from the County of Kane on the other hand. Any incompleteness of the story from Fleming's side should not be considered by you as somehow indicating that his suspicions were not justified, and any incompleteness of the story from the County's side should not be considered by you as somehow indicating that Fleming's suspicions were justified.

In summary, whatever evidence you have heard in that respect should not be considered by you as indicating either that any wrongdoing occurred or that it did not occur, or as suggesting that you are to decide that question at all. Once again, your task is to determine the motive or intent of Fakroddin in disciplining and dismissing Fleming.

## APPENDIX C

### Appendix B—Defendants' Response To Fee Petition

The following entries reflect excessive time in drafting pleadings, demand letters, research or review of research work product, filing or serving documents, and in discovery matters:

**TIME EXPENDED DRAFTING COMPLAINT**
**ATTY KATZ**

| | | |
|---|---|---|
| 7/17/85 | Revisions to draft complaint | 2' |
| 7/18/85 | Completing revisions to draft Fleming complaint; re-reading pertinent first amendment/employee termination and retaliatory discharge cases | 3' 45" |
| 10/03/85 | Analysis of draft pleadings and revisions to show "custom or policy"; conf. w/atty. Adams re same; redraft of portions of pleadings | 45" |

**ATTY ADAMS**

| | | |
|---|---|---|
| 4/06/85 | Work on intra-memo analyzing case and possible claims | 2' |
| 4/07/85 | Completing intra-office analysis memo re case and possible claims | 3' 30" |
| 7/02/85 | Work on outline and first draft of federal complaint; t/cw/clinet re status of case | 3' 30" |
| 7/10/85 | Completed outline of federal complaint; began work on final draft | 30" |
| 7/15/85 | Final draft of federal complaint completed for Counts I and II; additional review of potential Count III; conf. w/atty. Katz | 1' 30" |
| 7/22/85 | O/c w/client to verify complaint for factual accuracy, detail damages allegation and discuss subsequent action to be taken | 1' 45" |
| 10/10/85 | T/c w/client, review of changes proposed by atty. Katz; revisions to subsequent draft; o/c w/client reviewing final draft | 1' 30" |

**TIME EXPENDED IN DRAFTING DEMAND LETTER:**
**ATTY. KATZ**

| | | |
|---|---|---|
| 8/01/85 | Revising draft demand letter re § 1983 suit; conf. w/atty. Adams re same | 1' 45" |
| 7/24/85 | Work on first draft of demand letter to county outlining claim and requesting negotiation | 1' |

TIME EXPENDED IN "LEGAL RESEARCH"
LAW CLERK TIME

| | | |
|---|---|---|
| 5/22/85 | Research on § 1983 claim | 5' |
| 5/23/85 | Research on retaliatory discharge claim; began drafting complaint | 4' |
| 5/31/85 | Federal Digest research | 1' 30" |
| 6/06/85 | Federal research Endicott, Regents, Czurlanis, Califano and Shepards | 1' 30" |
| 6/07/85 | Finished federal research; started memo on federal case law | 2' 30" |
| 6/11/85 | Memo done on federal case law | 4' 30" |
| 6/13/85 | Memo on Illinois case law | 3' |
| 6/14/85 | Finished memo on Illinois common law | 2' 30" |
| 7/23/85 | Researched Illinois Digest | 1' 45" |
| 8/06/85 | Research on pleading county as defendant; started memo (actual time 4'; 2'NC) | 2' |
| 8/07/85 | Research on county liability; conf. w/atty. Adams (actual time 6'30"; 2'30"NC) | 4' |
| 8/08/85 | Finished memo and assembled appendices, shepardized cases on adequately pleading county as defendant | 3' 15" |
| 8/12/85 | Travel to Chicago Library for research | 1' 30" |
| 5/19/86 | Researched atty's fees for 1983 suits & FRCP 68 | 8' |
| 5/20/86 | Work on memo—atty's fees and Rule 68 | 4' |
| 5/21/86 | Finishing memo—FRCP 68 and atty's fees | 2' |
| 5/23/86 | General immunity—research | 5' |
| 5/24/86 | State's atty immunity—research | 6' |
| 5/27/86 | State's atty immunity—research | 5' 30" |
| 10/23/86 | Research on evidence of dep. under federal law | 2' |
| 10/23/86 | Research Evid. Dep. under Federal Law | 1' |
| 10/31/86 | Research Evid. Dep. under Federal Law | 1' |
| 9/04/87 | Research propriety of talking to Stout et al | 8' |

ATTORNEY TIME SPENT ON PREPARATION, FILING OR OTHER ROUTINE WORK CONNECTED WITH PLEADINGS AND SUBPOENAS:
ATTY. KATZ

| | | |
|---|---|---|
| 10/10/85 | Prep. of civil cover sheet, required appearance forms and affidavits, summons forms; t/c to district court clerk to check filing fee and verify necessary docs. for filing civil suit; proofreading complaint, etc.; office conf. w/B. Fleming | 3' |
| 10/11/85 | Filing civil rights complaint | 45" |
| 10/14/85 | Conf. w/atty. Adams re service of process on defendants | 15" |
| 10/23/85 | Filing return on service in district court and picking up deposition subpoena form | 15" |

ATTY. ADAMS

| | | |
|---|---|---|
| 4/10/87 | Research FRCP, local rules re procedure for subpoenaing witnesses for trial | 45" |
| 4/13/87 | Research on requirements for subpoenaing witnesses for trial | 30" |
| 8/25/87 | Travel to Chicago to obtain subpoenas for all witnesses; tel. conv. w/Atty Katz re subpoena types available and strategy for use of subpoena duces tecum; work on various subpoenas | 3' 45" |
| 8/26/87 | Research and analysis of validity of subpoena duces tecum at trial for various witnesses; prep. of long memo re same preparation of return of service form for subpoenas; tel. conv. w/Atty Boyle re strategy behind use of subpoena duces tecum; review of Local Rule 42 re subpoenas for medical experts; began draft of motion for leave to subpoena Dr. O'Shea (Actual time 7'15") | 5' 15" |
| 8/27/87 | Work on subpoena preparation; continued tel. calls to witnesses re scheduled data for appearance; completed motion for leave to subpoena Dr. O'Shea | 3' |
| 9/02/87 | Research on subpoena matters; use of subpoena duces tecum; preparation of language for specific duces tecum requests of certain witnesses; two conferences w/Attys Katz and Heap re trial issues | 4' |
| 9/04/87 | Work on subpoenas; revision of subpoenas duces tecum based on motion for diary original; tel. conv's. w/clerk's office; continued | |

calculation of mileage for certain witnesses; review of motion for original diary; conf. w/Attys Heap & Brooks — 45″

TIME EXPENDED PREPARING FOR TESTIMONY OF WITNESSES RONAN, DENCER AND O'SHEA

ATTY. ADAMS

| | | |
|---|---|---|
| 9/17/87 | Tel. call from Dr. O'Shea's office, re service on Dr. O'Shea; review of responses to various pending motions in limine | 2′ 30″ |
| 9/18/87 | Reviewing responses; work on examination; work on prep. for Mary Ronan; conf. w/Attys Katz & Heap re Dencer exam outline | 3′ |
| 9/19/87 | Work on Dr. O'Shea examination prep.; review notes on Dr. O'Shea dep.; extensive review of medical charts | 6′ |
| 9/23/87 | Work on outline, O'Shea examination | 4′ 45″ |
| 9/24/87 | Work on Dencer, O'Shea and Ronan examination questions and answers | 4′ 45″ |
| 9/26/87 | Work on detailed questions and answers for Dencer, O'Shea including detailed outline, actual questions and answers, research on possible objections; conf. w/Attys Katz & Heap re exhibits, other witnesses | 7′ |
| 9/27/87 | Work on various aspects of Fleming trial matters; work on Dencer examination preparation | 8′ 30″ |
| 9/29/87 | Travel to Kane County Highway Dept. for examination of Mary Landreth; final prep. for examination of Dencer; long office conf. w/Dencer | 10′ 45″ |
| 10/02/87 | Continued prep. for testimony of Dr. O'Shea; conf. w/Attys Katz & Heap re witnesses, modification of witness list; reviewing what witnesses will supply evidence for various elements; tel. conv. w/Dick Dencer | 4′ 45″ |
| 10/03/87 | Revisions to desired testimony, question and answers for Dencer, O'Shea, based on objections; additional questions based on defendants' offer of proof | 4′ |

THE FOLLOWING ENTRIES RELATE TO THE DEFAMATION COUNTERCLAIM

ATTY KATZ

| | | |
|---|---|---|
| 11/11/15 | Preliminary review of defendant's answer, affirmative defense and counterclaim in Fleming case; conf. w/atty. Adams re same | 15″ |
| 11/14/85 | Preliminary analysis of defendant's answer and counterclaims; conf. w/atty. Adams re same | 1′ 45″ |
| 11/20/85 | Review of case law re state's attorney's right to bring private court appearance on behalf of county official; review of statute of limitations on defamation and countervailing "revival" statute re permitted counterclaims; long memo to file | 2′ 30″ |
| 11/25/85 | Detailed review of defamation law; prep. of motion to oust and motion to amend complaint; confs. atty. Adams re dep. subpoena docs.; prep. notice papers; office conf. w/Mr. Fleming to review defendant's answer and counterclaim and discuss next steps | 6′ |
| 11/27/85 | Obtaining copies of pertinent materials from office file in *Britton v. Winfield Public Library* (1981 libel case) | 15″ |
| 12/4/85 | Travel to, prep. for and attendance at fed. ct. on motion to oust state's atty of Kane Co. as counsel on Fakroddin counterclaim; obtaining copies of Shadur decisions in Shorter and Coleman cases (re § 1983 stat. of limitations and defense counsel conflicts in civil rights cases; review of cases; analysis; notes to file and atty. Adams | 4′ |
| 1/22/86 | T/c B. Fleming re Fakroddin's substitute counsel, schedules for deps., Shadur's recent ruling in disqualification motion; files notes; check on background of atty. Robert Casey; conf. atty. Adams | 30″ |
| 2/06/86 | Review of motion and proposed appearance filings of substitute counsel for Fakroddin; research on whether attorney-client privilege will apply to pre-termination communications between company and attorneys; | 30″ |

| | | |
|---|---|---|
| 3/10/86 | Work on draft answer to counterclaim; research re ancillary jurisdiction of federal court under R13(a) and whether it exists in this case over defamation counterclaim; memo on ancillary jurisdiction | 4' 30" |
| 3/12/86 | Completing research—ancillary jur. argument—at county library in Wheaton; returned tel. call to Atty Casey (out); completing draft and answer to counterclaim; research—affidavit defenses to slander claim; revisions to and conf's. w/Atty Adams re discovery findings; tel. conv. and notes re conversation w/Atty Casey; office conf. w/Bob Fleming | 6' 15" |
| 3/17/86 | Obtaining issuance of deposition subpoena—Carter; reading defamation notes and cases; draft motion to dismiss counterclaim; preparation of notice re filing and motions | 3' 45" |
| 3/18/86 | Filing return on service (Carter deposition subpoena) & motions to dismiss Fakroddin counterclaim and for leave to file additional appearances | 30" |
| 3/21/86 | Review of policy provisions; tel. conv. w/insurance agent Dennis Kernes re possible coverage on counterclaim under homeowner's policy; letter to Mr. Kernes transmitting pleadings et al., background on suit | 1' 30" |
| 3/26/86 | Travel to and time spent at Kane County Highway Department completing review of documents produced by defendants; file notes; returned tel. call from Farmers Insurance agent Baxter (out); analysis of minutes and letter to Atty Akemann re producing executive session materials; conf. w/Atty Adams | 7' 45" |
| 3/27/86 | Tel. conv. w/Farmers Insurance adjuster Jim Baxter; file note | 15" |
| 3/30/86 | Work on memo to support dismissal motion | 2' |
| 3/31/86 | Completing memorandum in support of motion to dismiss, include additional research on ancillary jur. (Judge Shadur case and answering agreement); accompanying notice and transmittal letter to Judge Shadur; | 10' 30" |
| 4/02/86 | Conf. atty. Brooks re communications from Fleming ins. carrier; t/c office of Kane Co. State's Atty.; t/c client and letter to him sending copies of defts' discovery answers and of pltf's memorandum in support of counterclaim dismissal | 1' |
| 4/21/86 | Review atty. Adams' memo re 4/18/86 t/c from atty. Akemann; checking Fed.Rules Civ.Pro. re discovery motions; t/cs Akemann and atty. Schuster re postponing rest of Fakroddin dep.; revision of, proofreading and filing response memo on motion to dismiss counterclaim | 8' |
| 4/28/86 | Review of counterpltf/defts' reply memo re striking counterclaim, aff. defenses; letter to atty. Schuster re same; work on position memo for Rule 26(f) conf. | 6' |
| 7/20/86 | Work on abstract of Fakroddin dep; review of Phil. Newsprs. Inc. v. Hepps (new U.S. SupCt case re defamation plaintiff's burden of proof) | 2' 30" |
| 3/25/87 | Review of recent Ill.S.Ct. case on defamation (*Owen v. Carr*) and file memo re "opinion" characterization of plaintiff's disparaging stmts. | 45" |
| 4/09/87 | Review of defendant/counter plaintiff's 1st set of interrogatories to Fleming; tel. conv. w/Atty Schuster re untimeliness of interrogatories and timetable exchange of pre-trial materials; file notes | 1' |
| 9/07/87 | Case law reading and work on jury instruction—counterclaim | 9' 15" |
| 9/12/87 | Reading July, 1987 *Brown & Williamson* case; rereading earlier 7th Cir. cases re defamation | 2' 45" |

**ATTORNEY ADAMS**

| | | |
|---|---|---|
| 11/11/85 | Letter to client sending county's response to complaint and outlining course of action; conf/w/atty. Katz re response to counterclaim | 1' 30" |
| 11/13/85 | Research on possible jurisdictional defense to county's counterclaim | 3' 45" |
| 11/14/85 | Research on defamation issues, slander per se, special damages, innocent construction rule, etc. | 3' 30" |

| | | |
|---|---|---|
| 11/16/85 | Continued research on defamation issues; prep. of memos outlining findings on jurisdictional defense, preliminary defamation research | 2′ |
| 3/12/86 | Prepared Notice of Depositions—Nabi Fakroddin, Mary Ronan, William Carter; prepared minute order, Motion for Leave to File Appearance, secured court reporter for depositions, office conf. w/Atty Katz to review proposed answer to counterclaim with client and viability of Motion to Dismiss based upon insufficient ancillary jurisdiction; office conf. w/client | 2′ |
| 3/31/86 | Prepared abstract of Transportation Committee meetings minutes produced per discovery request to Wheaton to obtain case law for memorandum in support of plaintiff's motion to dismiss counterclaim | 3′ 45″ |
| 4/01/86 | Review and proof of defendants' memo in support of motion to dismiss; t/cs w/atty. Katz | 30″ |
| 4/17/86 | Research in preparation for reply brief; review of articles on new cases; memo to file | 5′ 15″ |
| 4/18/86 | Work on first draft of reply brief on counterclaim; t/c Ademann re possible 26(f) discovery conf. vs. Rule 30(d) motion; review of issues; memo to file | 6′ |
| 4/21/86 | Completed reply memorandum; conf. w/atty. Katz re revisions; prep. of notice of filing | 3′ 45″ |
| 8/22/86 | Research on effect of plaintiff's Fakroddin's republication of alleged defamatory statements on his own claims for damages | 1′ 30″ |
| 8/26/86 | Continued research on effect of plaintiff's own republication of alleged defamatory remarks on his claim for damages | 1′ 30″ |
| 8/27/86 | Review of case law on republication by plaintiff in Wheaton | 30″ |
| 9/25/86 | Memo to Atty Katz re analysis of counterclaim defense based upon plaintiff's republication of alleged defamatory remarks; material damage re Dencer | 2′ 15″ |
| 12/04/86 | Tel. conv's. w/Ted Schuster re possible stipulation re Amended Counterclaim; review of first proposed amended counterclaim | 30″ |
| 12/08/86 | Analysis of second proposed amended counterclaim; tel. conv. w/Atty Katz re defense counsel's proposed filing of same; attempted tel. conv. w/Schuster (Actual time 45″) | 30″ |
| 12/09/86 | Tel. conv. w/defense counsel Schuster re motion date for filing amended counterclaim | 15″ |
| 12/19/86 | Began answer to amended counterclaim | 30″ |
| 12/22/86 | Work on answer to amended counterclaim | 1′ |
| 1/20/87 | Tel. call from client re 1/16/87 court action, dep. transcripts, settlement offer from Fakroddin on counterclaim; memo to file | 15″ |
| 5/12/87 | Preliminary research on response to counter plaintiff's motion in limine requesting reconsideration of previous court ruling on "per se" defamation, prep. for pre-trial conference | 3′ |
| 11/17/87 | Continued research/analysis of counter-plaintiff's argument in new trial motion *Catalano v. Pechous, Costello* cases, *Owen v. Carr* | 2′ 15″ |

**ATTY BROOKS**

| | | |
|---|---|---|
| 3/12/86 | Conf. w/Atty Katz re answer and counterclaim; review of pleadings | 1′ |
| 11/13/86 | Review of 11/12/86 correspondence from Ted Schuster; file notes re (2d) addt'l answer of Fakroddin and review of his discovery responses to date; file notes re proposed Am Counterclaim & stip as to effect of court's 5/27/86 order; research re Rule 15(a) and whether "pledge over" waivers object. to rulings on original complaint under federal practice; additional research re R404 in civil context; tel. conv. w/Atty Adams re possible opposition to Am. Counterclaim | 5′ 15″ |
| 11/19/86 | Travel to and attendance at court date on Fakroddin motion to amend counterclaim; tel. conv. w/Bob Fleming re same | 3′ |
| 3/25/87 | Review status of counterclaim; conf. w/Atty Katz | 30″ |

THE FOLLOWING ENTRIES RELATE TO THE DISMISSED COUNT II

ATTY KATZ

| | | |
|---|---|---|
| 6/17/87 | Review of and revisions to draft memo v. dismissal of Count II; (Actual time 9'45") | 7' 45" |

ATTY ADAMS

| | | |
|---|---|---|
| 6/09/87 | Research on tolling of limitation period through hearing process; research on continuing injury theory in prep. for response to defendants' motion to dismiss Count II | 2' 45" |
| 6/10/87 | Review of letter from Gallagher to Judge Shadur; continued research on plaintiff's response to motion to dismiss Count II | 2' |
| 6/11/87 | Continued research on issues relative to response to defendants' motion to dismiss Count II; review of Illinois case law applying notice provisions | 2' |
| 6/15/87 | Completed outline of response to defendants' motion to dismiss Count II; work on first draft of response; began research on cases cited by defendant | 3' 30" |
| 6/16/87 | Research on cases cited by defendant; completed first draft of response to defendants' motion to dismiss Count II; began work on second draft | 4' |
| 6/17/87 | Work on revisions to response to defendants' motion to dismiss Count II; research *Gould* case; continued analysis of defendants' cases (Actual time 9') | 6' |

THE FOLLOWING ENTRIES ARE FOR TIME UNRELATED TO THE SUCCESSFUL PROSECUTION OF A CIVIL RIGHTS ACTION:

ATTY WYETH

| | | |
|---|---|---|
| 4/08/85 | Review of client's proposed presentation before the Kane County Board revising presentation for client | 45" |
| 4/09/85 | Travel to Geneva to attend Kane County Board meeting re client's presentation of Orchard Road project to the Board | 1' 15" |
| 9/15/87 | Conf. w/Atty Katz re FOIA request w/the County of Kane for production of outside atty's fees inf. | 15" |
| 9/15/87 | Tel. conv. w/Atty Dean Chionis re filing a FOIA request in Kane County | 15" |
| 10/08/87 | Legal research re definition of income for Federal Income Tax purposes (IRS 61); notes to file all re taxability of past and future wages/salary recovered by plaintiff/client in civil suit | 1' |

ATTY KATZ

| | | |
|---|---|---|
| 9/19/85 | File work; review of McCrimmen § 1983 case (dist. ct. decision) pending v. Kane Co. over unrelated matter; additional check of cases on "custom or policy" | 1' 45" |
| 4/11/86 | Returning t/c Beacon News reporter and sending copies of pleadings to him; t/c Sugar Grove Twp. Hwy. Comm.; file notes; reading cases on a-c priv.; t/c atty. Ochsenschlager re Huggins interview; file notes | 2' 30" |
| 8/17/87 | Additional reading—jury selection; letter to Atty Boyle re jury selection strategies in anticipation of 8/20/87 meeting | 4' |
| 8/20/87 | Breakfast meeting w/Atty Boyle to discuss jury selection and prep. for and appearance in court on status date re Rule 11 sanctions; follow-up conf. w/Atty Adams re same | 3' |
| 8/21/87 | Tel. conv. w/Atty Goldman re voir dire et al. trial procedure before Judge Shadur; conf. w/Atty Adams re same; file notes | 15" |

ATTY ADAMS

| | | |
|---|---|---|
| 1/02/86 | T/c w/client, discussion of pending investigation of county highway practices by Dept. of Registration and Education; conf. w/atty. Katz and memo to file re same | 30" |
| 1/29/86 | T/cs (2) w/client re Dept. of Regis. and Ed. investigation, discovery, etc.; t/c w/Dept. of Reg. and Ed.; memo to file | 30" |
| 3/04/86 | Tel. conv. w/client re pending discovery timetable; discussion of possible investigation by Department of Registration and Education | 15" |

THE FOLLOWING ENTRIES REFLECT TIME GENERATED BY ATTY. HEAP'S LAST–MINUTE ENTRY INTO THIS CASE:

ATTY HEAP

| Date | Description | Time |
|---|---|---|
| 8/24/87 | Conf. w/Atty Katz and Atty Adams re status of case | 1' |
| 8/25/87 | Review of Shadur opinion, letter of Atty Katz dated 8/13/87; pretrial order and subsequent submission to order | 2' 15" |
| 8/28/87 | Conf. w/Atty Katz and Adams re preparation for trial | 2' 30" |
| 9/01/87 | Conf. w/Attys Katz & Adams re William Barrett's testimony and upcoming status meeting | 2' 15" |
| 9/02/87 | Conf. w/Atty Adams re procedures in issuing subpoenas | 45" |
| 9/02/87 | Conf. w/Attys Katz and Adams re subpoenas, jury instruction and general status of case | 2' 15" |
| 9/03/87 | Review of dep. of Robert Fleming and prep. for trial | 1' 45" |
| 9/03/87 | Conf. w/Attys Katz and Brooks re interview of defense witnesses Holcomb, Stout & Johnson | 45" |
| 9/03/87 | T/C with Attorney Katz re request to modify PTO to include additional exhibits | 1' 45" |
| 9/03/87 | Tel. conf. w/Atty Katz re use of full diary at trial and motion in limine re use of prior bad acts of plaintiff | 30" |
| 9/04/87 | T/C with Attorney Katz re allegation of defamation and issues relating thereto | 15" |
| 9/04/87 | Review of dep. of Robert Fleming in prep. for trial | 2' 30" |
| 9/08/87 | Review of proposed jury instructions w/Attys Katz and Adams | 5' |
| 9/08/87 | Review of dep. of Robert Fleming in prep. for trial | 1' 30" |
| 9/08/87 | Review of depositions of Mary Ronan and Richard Dencer in prep. for trial | 3' |
| 9/09/87 | Review of dep. of Nabi Fakroddin in prep. of trial | 7' 45" |
| 9/10/87 | Appearance in Fed. Court on plaintiff's motions re physician subpoenas, trial briefs, et al. | 3' |
| 9/10/87 | Review of dep. of Nabi Fakroddin in prep. for trial | 4' 30" |
| 9/10/87 | Conf. w/Attys Katz & Adams re division of witnesses to be examined at trial | 1' 30" |
| 9/11/87 | Review of case law re: 1983 action and defamation counterclaim as related to issues to be proven at trial | 3' |
| 9/11/87 | Conference with Attorneys Katz and Adams re prep. of witnesses to be used at trial; conf. w/Atty Katz re direct examination of Robert Fleming | 3' 30" |
| 9/12/87 | Review of dep of William Barrett in prep. for trial | 5' 30" |
| 9/13/87 | Review and analysis of dep of William Barrett in prep. for trial | 3' 30" |
| 9/13/87 | Conference with Attorney Katz re necessary proof of section 1983 case | 2' 45" |
| 9/14/87 | Lunch meeting with client and Attys Adams & Katz re trial prep. | 1' 30" |
| 9/15/87 | Conference with Attorney Adams re questioning of witness Richard Dencer; review of exhibits to be used at trial | 2' |
| 9/16/87 | Conf. w/Attys Katz & Adams re questions to be submitted at voir dire and proposed general and section 1983 instructions by defendant | 4' |
| 9/17/87 | Review of Defendant's response to pending motions and conf. w/Atty Katz re same | 1' 45" |
| 9/18/87 | Conference with Attorney Katz re decisions of Judge Shadur on pre-trial motions | 1' 30" |
| 9/18/87 | Conf. w/Attys Katz & Adams re initial prep. of question and answer for Richard Dencer's testimony | 1' 30" |
| 9/19/87 | Conference with Attorney Katz re defendants' pre-trial memo and lines of questioning witnesses at trial; notes to file re William Barrett's testimony | 3' 30" |
| 9/21/87 | Review of dep. of William Barrett and Mary Landreth in prep. for trial; conf. w/Atty Katz re trial strategy; conf. w/Atty Adams re impeachment of witnesses and other related trial procedures | 4' 30" |

| | | |
|---|---|---|
| 9/22/87 | Review of dep. in prep. for testimony at trial | 4' |
| 9/23/87 | Review of all documentary evidence in prep. for testimony of William Barrett | 3' 45" |
| 9/23/87 | Conf. w/Atty Katz re prep. for examination of Robert Fleming | 1' 30" |
| 9/25/87 | Conf. w/Attys Katz & Adams re Landreth dep. set for 10/29/87 and anticipated testimony from William Carter | 2' |
| 10/03/87 | Conf. w/Atty Adams re prep. of his witnesses to be examined at trial | 2' 45" |
| 10/03/87 | Conference with Attorney Katz re prep. of questions for witnesses she will be exam. at trial | 2' |
| 10/4/87 | Conference with Attorney Adams re exam. of various witnesses, potential problems w/objections on witnesses and evidence needed from such testimony | 3' |
| 10/4/87 | Conf. w/Attys Katz and Adams re trial prep. and strategy | 2' 30" |

THE FOLLOWING ENTRIES REFLECT INEXPERIENCE WITH EVIDENTIARY AND PROOF ISSUES:

ATTY HEAP

| | | |
|---|---|---|
| 5/14/87 | Telephone call with attorney Mitten re federal rules of evidence in comparison to state rules | 30" |

ATTY ADAMS

| | | |
|---|---|---|
| 10/10/87 | Extensive research on claim for lost sick pay vacation pay; office work, maintenance of files; review analysis of trial notes | 3' 15" |
| 10/12/87 | Review of trial notes; office work on file; memo to file re claim for lost vacation and sick pay | 3' |

ATTY WYETH

| | | |
|---|---|---|
| 10/8/87 | Review of text on present value calculation for use in damages exhibit | 1' 45" |
| 10/8/87 | Formulation of present value of future string of income chart | 2' 30" |
| 10/8/87 | Strategy session w/Atty Katz on presentation of present value damages exhibit as to both past and future values | 1' |
| 10/8/87 | Second draft reforming present value of future earning table; proofing and correlating final draft | 1' 30" |
| 10/12/87 | Tel. conv. w/Atty Katz re update needed on Exhibits 35 & 36 re removal of vacation pay column; re calculation of discounted value in future | 15" |
| 10/12/87 | Re-write of salary exhibits to remove references to vacation and sick pay, proofing same | 2' 15" |

LAW CLERK EDELBROCK

| | | |
|---|---|---|
| 10/7/87 | Research damages issue | 2' |
| 10/8/87 | Research stock fund damages | 8' |

THE FOLLOWING ENTRY IS INCOMPLETE, AND IS PRODUCED HERE AS IT APPEARS IN PLAINTIFF'S PETITION:

LAW CLERK

| | | |
|---|---|---|
| 10/6/86 | Research on requirements to obtain | 2' |

THE FOLLOWING TIME ENTRIES FOR ATTY. HEAP ON OCTOBER 7 AND OCTOBER 8 TOTAL IN EXCESS OF TWENTY-FOUR HOURS. OBVIOUSLY, THE DOUBLE ENTRIES FOR TRIAL ATTENDANCE MUST BE DELETED:

| | | |
|---|---|---|
| 10/7/87 | Travel to and attendance at 3rd day of trial | 11' 15" |
| 10/7/87 | Review of Landreth dep. w/notes to file re objections to be made | 3' 45" |
| 10/7/87 | Travel to and attendance at 3rd day of trial | 11' 15" |
| 10/8/87 | Travel to and attendance at 4th day of trial | 10' 30" |
| 10/8/87 | Travel to and attendance at 4th day of trial | 10' 30" |
| 10/8/87 | Conf. w/Atty Katz and Adams re progress of trial; conf. w/Mary Fleming re testimony; conf. w/Atty Adams re supplemental motion in limine | 4' |